UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

METROPOLITAN PARK DISTRICT OF TACOMA, a Washington corporation,

Plaintiff,

v.

LEISURE TRANSPORT SOLUTIONS LIMITED, a British private limited company d/b/a TDI PRODUCTION SERVICES; and SHAUN O'BRIEN, an individual,

Defendants.

CASE NO. 3:26-cv-05412-BHS

ORDER

This matter is before the Court on defendants Leisure Transport Solutions Limited and Shaun O'Brien's motion to dismiss. Dkt. 12.

## I. BACKGROUND

Plaintiff Metropolitan Parks District of Tacoma is a Washington municipal corporation. It operates the Northwest Trek Wildlife Park. In 2019, Metro Parks placed an order with a British company, Leisure Transport Solutions Limited, for six electric trams to use at Northwest Trek. Metro Parks agreed to pay $500,000 per tram; $3 million

in total. Leisure Transport then contracted with a Portuguese company, Deltrain, to manufacture the trams. The trams were to be delivered over the course of two years. However, in response to disruptions wrought by COVID-19, the parties mutually agreed to extend the delivery window by two years, with the fifth and sixth trams to be delivered in February and March 2022. That did not happen.

Metro Parks alleges that Leisure Transport's Director, Shaun O'Brien, told it that the fifth and sixth trams were in production in March 2021. Based on this alleged representation, Metro Parks paid Leisure Transport an installment of $350,000, the amount it claims was due after production had commenced. On January 14, 2022, O'Brien informed Metro Parks that the fifth tram would be completed the following week and delivered in May, and that the sixth tram would be completed by the end of that month. Metro Parks responded that this was "not ideal" but that "having five of the six on-site in May will allow us to launch." Dkt. 1-2 at ¶3.14. O'Brien allegedly responded "[w]e will certainly do our best be assured to get them all on site for the opening, that's a promise." *Id.* at ¶3.15. A few days later, O'Brien confirmed that the fifth tram would be completed that week and that he had contacted Leisure Transport's shipping agency to book space for the last two trams. Relying on these representations, Metro Parks then issued a second payment in the amount of $250,000, which was the amount due upon "factory acceptance test on [fifth] complete train at Deltrain factory." *See id.* at ¶3.5.

Metro Parks alleges that these representations were all false, and that the production of the fifth and sixth trams had not yet started when it issued the first payment of $350,000, or even when it made the second payment of $250,000. It further alleges

that O'Brien continued to mislead it about the status of the trams for another year, claiming that the trams were complete but defective, and then, in January 2023, revealing that the sixth tram was only 90% complete. Metro Parks then contacted the manufacturer, Deltrain, which informed Metro Parks that Leisure Transport was $900,000 in arrears on the fifth and sixth trams. Metro Parks alleges that Deltrain then terminated its agreement with Leisure Transport and that Metro Parks had to purchase the remaining two trams directly from Deltrain. Metro Parks then demanded that Leisure Transport refund the $600,000 it had paid for the fifth and sixth trams. Leisure Transport reportedly said it would do so but never did.

In July 2025, Metro Parks sued Leisure Transport and O'Brien in Pierce County Superior Court asserting a breach of contract claim against Leisure Transport, and fraudulent and negligent misrepresentation claims against O'Brien. Dkt 8–2. Metro Parks hired a process server who attested to personally serving O'Brien on September 9, 2025, Dkt. 8–7, and to serving Leisure Transport the same day by leaving the documents with "Mr. Elliot Profitt (Chief Engineer)," Dkt. 8–8. Metro Parks obtained an order of default against the defendants, which was set aside pursuant to a stipulation. Dkts. 8–10, 8–13. Metro Parks then filed an Amended Complaint in April 2026, which the defendants timely removed here. The defendants now move to dismiss Metro Parks' Amended Complaint.

## II. DISCUSSION

The Defendants move to dismiss on several grounds. Leisure Transport and O'Brien both move to dismiss the Amended Complaint pursuant to Federal Rule of Civil

Procedure 12(b)(5) for insufficient service of process, arguing that Metro Parks failed to abide the requirement of the Hague Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters. O'Brien also moves to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2). The Defendants additionally move to dismiss Metro Parks' claims against them under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. These are considered in turn.

**A. Metro Parks has properly served Leisure Transport and O'Brien**

**1. Metro Parks has complied with the Hague Convention on Service**

In cases removed from state to federal court, challenges to the sufficiency of service are generally controlled by state law. *Whidbee v. Pierce Cnty.*, 857 F.3d 1019, 1023 (9th Cir. 2017). However, because the defendants here are residents of the United Kingdom, a signatory to the Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, Nov. 15, 1965 ("the Convention"), 20 U.S.T. 361, T.I.A.S. No. 6638, the operative question is whether service complied with the Convention, subject to any objections on the part of the United Kingdom. *See Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 705 (1988) ("compliance with the Convention is mandatory in all cases to which it applies.")

The purpose of the Convention is to simplify and expedite the service of documents pertaining to civil and commercial legal matters between signatory states. To that end, the Convention requires each signatory to designate a "Central Authority" to received requests for service of documents from other countries. *Volkswagenwerk*, 486 U.S. at 698-99 (citing 20 U.S.T. 362, T.I.A.S. 6638, Art. 2). The Convention also

preserves "the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or *other competent persons* of the State of destination" to the extent that "the State of destination does not object." U.S.T. 362, T.I.A.S. 6638, Art. 10(c) (emphasis added).

Whether a process server is considered a "competent person" to effect service on residents of the United Kingdom is a question of United Kingdom law and practice. *See Miramontes v. Mills*, 2014 WL 12738922, at *4 (C.D. Cal. June 25, 2014). When it signed the Service Convention, the United Kingdom entered a declaration with respect to Article 10(c), saying "documents for service through official channels will be accepted in the United Kingdom only by the central or additional authorities and only from judicial, consular or diplomatic officers of other Contracting States."[1] In 1980, it clarified that the declaration "does not preclude any person in another Contracting State who is interested in a judicial proceeding (including his lawyer) from effecting service in the United Kingdom 'directly' through a competent person other than a judicial officer or official, e.g., a solicitor." *Id.* And in 2003, the United Kingdom "confirmed its . . . preference for the use of direct service through English solicitors on residents of England and Wales."[2] The parties contest the meaning of these statements. Did the United Kingdom mean to

---

[1] Declarations Made at the Time of Deposit of the Instruments of Ratification, U.K.-N. Ir., Nov. 17, 1967, 658 U.N.T.S. at 193 (emphasis added), https://www.hcch.net/en/instruments/conventions/status-table/notifications/?csid=427&disp=resdn (last visited Sept. 11, 2026).

[2] *Conclusions and Recommendations Adopted by the Special Commission on the Practical Operation of the Hague Apostille, Evidence and Service Conventions* ¶ 58 (November 20, 2003), available at http://www.hcch.net/index-e n.php? act=publications.details & pid=3121 & dtid=2.

limit the meaning of "competent person" to solicitors, or was it simply offering them as an example?

Defendants offer two cases in support of their position that solicitors are the only persons—aside from the Central Authority or judicial officers—competent to effect service under Article 10(c). The first case is *Thomas & Thomas Rodmakers, Inc. v. Sharpe's, Inc.*, No. 1:06-CV-421, 2007 WL 1057382, at *5 (S.D. Ohio Apr. 5, 2007), where the court reasoned that between the United Kingdom's declaration and its clarifying letter, it was "evident . . . personal service of foreign process in the United Kingdom must be accomplished by a solicitor." The second case is *Sec. & Exch. Comm'n v. Bowerman*, No. 24-CV-12282-AK, 2024 WL 4872335 (D. Mass. Nov. 22, 2024), which relied on the *Thomas* decision to hold that the SEC could not rely on a private process server to serve a UK resident.

The majority view—and in this Court's view, the more persuasive one—is that although the United Kingdom might prefer service through solicitors, it does not consider them the only persons competent to serve documents under Article 10(c). The United Kingdom's 1980 letter to the HCCH says that service may be accomplished directly through a "competent person other than a judicial officer or official, *e.g., a solicitor*." (emphasis added). As noted in *Sparrow Cap., LLC v. Katcharian*, "'E.g.' typically means 'for example,' and this choice of wording implies that solicitors are not the only category of 'competent persons.'" No. 11-CV-34-WOB, 2013 WL 12176855 (E.D. Ky. Sept. 13, 2013), report and recommendation adopted, No. CV 2011-34 (WOB-CJS), 2013 WL 12177260 (E.D. Ky. Sept. 26, 2013). Similarly, in *Baskett v. Autonomous Rsch. LLP, No.*

17-CV-9237 (VSB), 2018 WL 4757962 (S.D.N.Y. Sept. 28, 2018), the court concluded that the United Kingdom's statements "indicat[e] that the United Kingdom prefers that a solicitor be used for direct service on their residents, but that there is no explicit requirement that solicitor be used."[3] The United Kingdom's statement is better read as hortatory, not mandatory.

This conclusion is further supported by the United Kingdom's responses to a 2022 questionnaire from the HCCH.[4] One of the questions posed was "has your State objected to service under Article 10(b)?" *Id.* at ¶24. The United Kingdom responded, "no." *Id.* The next questions read, "[i]f no objection has been made, which of the following categories does your State recognize as a 'judicial officer, official or other competent person' under Article 10(b), either for sending or receiving?" to which the United Kingdom responded by listing attorneys or solicitors bailiffs, huissiers, court officials, and *process servers*. *Id.* at ¶24.1. The United Kingdom further indicated that it had no objection to Article 10(c), and although the questionnaire did not ask the respondents to confirm whether it defined "competent persons" the same for purposes of Article 10(c),

---

[3] *See also Health Sci. Distributors, Co. v. Usher-Sparks*, No. 6:10-CV-1797-ORL-31, 2012 WL 601148 (M.D. Fla. Jan. 20, 2012), report and recommendation adopted, No. 6:10-CV-1797-ORL-31, 2012 WL 601204 (M.D. Fla. Feb. 23, 2012) ("Because service of process by a process server is a method permitted by English law, it is valid under Article 10(c)"); *Selmani v. Kline*, No. 2:16-CV-00264 (WJM), 2016 WL 5339574 (D.N.J. Sept. 22, 2016) (service by process server in United Kingdom was sufficient); *Hoffman v. Bailey*, 996 F. Supp. 2d 477 (E.D. La. 2014).

[4] United Kingdom, *Questionnaire Relating to the* Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters *(Service Convention)* (2022), https://assets.hcch.net/docs/bea0fa65-cf37-4bde-b5cc-864c2f4b8d8b.pdf.

the Court sees no obvious reason why process servers would not be considered "competent persons" to serve documents received under 10(b), but not 10(c).[5]

The defendants further argue that the decisions relied on by Metro Parks have either failed to engage with the United Kingdom's internal rules of civil procedure, or else misinterpreted them. The Court disagrees. It is true that the civil procedure rules (CPRs) contain a separate section dealing with "service of documents from foreign courts or tribunals." CPR §6.48-6.52. It is also true that those provisions contemplate service by the Senior Master, who determines the method of service, and further contemplates that the Senior Master will rely on process servers in at least some instances. *Id.* at §§ 6.51 ("The Senior Master will determine the method of service"), 6.52 (outlining required actions "[w]here service of a document has been effected by a process server.") From these provisions, the Defendants reason that "only the [Senior] Master is competent to serve foreign complaints," and that the United Kingdom, in its 1980 letter confirming that service could be accomplished through other competent persons, did not mean to refer to service of foreign complaints. Dkt. 19 at 3-4. This distinction is unconvincing.

CPR §6.48 says "this Section applies to the service in England and Wales of *any document* in connection with civil or commercial proceedings in a foreign court or tribunal" (emphasis added), without limitation to claims forms. If the Court were to adopt

[5] The Court observes that the United Kingdom's position on this may have shifted. In response to a similar questionnaire in 2008, it answered this question by ticking only the box for "attorneys and solicitors," and no others. United Kingdom, *Questionnaire of July 2008 Relating to the* Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters *(Service Convention)* ¶46 (2008), https://assets.hcch.net/upload/wop/2008uk14.pdf.

the defendants' reading of the CPRs, it would negate the United Kingdom's representation that other competent persons—including process servers—can serve documents *directly* on residents of the United Kingdom. The better reading is that CPR §§ 6.48-6.54 describes the process to be used when documents are served through the United Kingdom's central authority pursuant to a request through official channels. CPR § 6.50 says that when the foreign court of tribunal is in a convention country, the Senior Master will serve a document "upon receipt of a written request for service . . . from a consular or other authority of that country." (citation modified). This language recalls the United Kingdom's narrow declaration concerning "documents for service through official channels," which it said would "be accepted in the United Kingdom only by the central or additional authorities, and only from judicial, consular or diplomatic officers of other Contracting States." In short, the United Kingdom's declaration prescribes who its central authority will accept service requests from, and CPR §§ 6.48-6.54 implements that process, but neither touch upon the parallel process by which service is effected directly through other "competent persons."

It is undisputed that Metro Parks did not employ a solicitor licensed in the United Kingdom when it served the defendants in 2025. It hired a process server. The Court is persuaded that process servers are competent to effect service in the United Kingdom under the Service Convention.

**2. Metro Parks original attempt to serve Leisure Transport was deficient, but it has since cured the defect**

Leisure Transport further argues that the individual on whom Metro Parks originally effected service—Elliott Profitt—was never its employee and therefore could not have accepted service on its behalf. It also argues Metro Parks' later efforts to cure this defect were inconsistent with UK law, and untimely.

Metro Parks' process server signed a proof of service indicating that he attempted to serve Leisure Transport by leaving the documents with "Mr. Elliott Profitt (Chief Engineer)." Dkt. 8–9. Leisure Transport has submitted a declaration from its Director, Rupert Symons, attesting that "Mr. Profitt is not an employee, officer, or director of LTS or affiliated with the company in any way." Dkt. 3. Leisure Transport argues that service was deficient, and Metro Parks offers no response. The Court considers this to be a concession by Metro Parks that its original attempt to serve Leisure Transport in 2025 was deficient. *See Shorter v. Los Angeles Unified Sch. Dist.*, 2013 WL 6331204 at *5 (C.D. Cal. Dec. 4, 2013).

On June 30, 2026, Metro Parks filed an affidavit signed by Curtis Allen, a solicitor in the United Kingdom, attesting that he travelled to the registered address of Leisure Transport on June 12, 2026. Dkt. 18. Upon arrival, he spoke to a receptionist and informed her that he was there to see Leisure Transport. *Id.* at 2. The receptionist then brought her practice manager. Allen again introduced himself and advised the practice manager that he was there to serve legal documents on Leisure Transport. *Id.* He informed her that the documents were urgent and related to legal proceedings and left

them on the reception desk. *Id.* Leisure Transport asks that the Court strike Mr. Allen's declaration as untimely, or else find that his efforts to serve Leisure Transport were insufficient under UK Law. The latter point will be considered first.

Leisure Transport argues that a claim form/complaint must be personally served on a corporation. It contrasts CPR § 6.3(1), which it represents to be the provision governing service of claim forms/complaints, and CPR § 6.3(2) (service on companies), which it says "appl[ies] only *after* a claim form has been properly served." Dkt. 19 at 5. Leisure Transport fails to acknowledge that both provisions fall under title II, "Service of the Claim Form in the Jurisdiction," and that separate title deals with "Service of Documents Other Than the Claim Form in the United Kingdom." It is evident from the overall structure of the rules that § 6.3(2) covers service of claim forms on companies, and that in addition to "any method permitted under this Part," a company may be served by "any of the methods of service permitted under the Companies Act of 2006." The Companies Act, in turn, says "[a] document may be served on a company registered under this Act by leaving it at, or sending it by post to, the company's registered office." Companies Act 2006, c. 46, § 1139(1).

The Court concludes that Metro Parks effected service on Leisure Transport in June 2026. Mr. Allen's affidavit was not untimely under the circumstances, nor does the Court find that Leisure Transport was unfairly prejudiced by it. Metro Parks gave notice in its response brief that it was making a renewed effort to serve both defendants and that proof of service would be forthcoming. Leisure Transport raises a fair question about the delay between when Mr. Allen served the documents on June 12, and Metro Parks' filing

the proof of service on June 30, but Leisure Transport nevertheless was able to address it in its reply and does not claim it was otherwise prejudiced by the timing of the filing.

Metro Parks properly served defendants Leisure Transport and O'Brien. Their Rule 12(b)(5) motions to dismiss for lack of proper service are **DENIED**.

**B. This Court has specific personal jurisdiction over O'Brien with respect to Metro Parks' claims**

O'Brien argues that this Court lacks jurisdiction over him and moves to dismiss under Rule 12(b)(2). He argues that his communications with Metro Parks did not constitute the "minimum contacts" necessary to exercise jurisdiction over him consistent with his due process rights. He further argues that exercising jurisdiction would be unreasonable considering the burden it would impose on him, an individual, to litigate this case in another country.

Three conditions must be satisfied before this Court will exercise specific jurisdiction over a non-resident defendant: "(1) the defendant must either "purposefully direct his activities" toward the forum or "purposefully avail[ ] himself of the privileges of conducting activities in the forum"; (2) "the claim must be one which arises out of or relates to the defendant's forum-related activities"; and (3) "the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable." *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017). The plaintiff has the burden of satisfying the first two prongs, and if successful, the burden shifts to the defendant to make out a compelling case why exercising jurisdiction would not be reasonable. *Id.* at 1068-69.

Because Metro Parks' claims against O'Brien sound in tort, the Court employs the "purposeful direction" test at step one. *See id.* The purposeful direction test asks whether the defendant (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to suffer in the forum state. *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002). Metro Parks contends that O'Brien directed communications containing false statements of fact to Metro Parks, which he knew was in Washington, and that O'Brien knew any resulting harm would be suffered in Washington. It argues that this case is akin to *Chulsky v. Golden Corral Corp.*, 583 F. Supp. 3d 1059, 1076-77 (S.D. Ohio 2022), where an Ohio court found personal jurisdiction over a non-resident defendant based on the sexually harassing text messages he sent to the plaintiff in Ohio and the resulting harm she suffered there, or like other cases in which out-of-state defendants have directed tortuous communications at the forum. Dkt. 15 at 9–10 (citing *Stone v. Nationwide Mut. Ins. Co*., No. 1:21-CV-00960-LY, 2022 WL 607883 (W.D. Tex. Mar. 1, 2022) (explaining that when the content of communications with a forum gives rise to intentional tort claims, "this alone constitutes purposeful availment." (quoting *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999)) and *Slade Gorton & Co. v. HSBC Bank Canada*, No. 13-CV-12290-DJC, 2014 WL 4772264 (D. Mass. Sept. 23, 2014) (same)).

O'Brien argues that actions he took in the course of his employment with Leisure Transport cannot give rise to personal jurisdiction over him because he derived no personal benefit from his actions, nor was he physically present in Washington when he took them. He relies primarily on *Instasol, LLC v. EM Digital Ltd.*, No. CV C18-0391-

JCC, 2018 WL 3831292 (W.D. Wash. Aug. 13, 2018). Instasol sued the UK-based company EM Digital and its CEO over a $400,000 payment. The contract was negotiated in person in England and India, and over phone and email. Instasol argued that the numerous phone calls and emails between the UK-based defendants and the Washington-based plaintiffs should be considered relevant contacts with Washington for purposes of establishing personal jurisdiction, but the court declined, noting "in an age of on-the-go communication, the Court cannot find such communications to be purposeful activity directed at Washington." *Id.* at *2. Defendants also cite *Kransco Mfg. v. Markwitz*, 656 F.2d 1376, 1379 (9th Cir. 1981) and *Fleury v. Platt*, No. C24-1321-JCC, 2025 WL 509499, at *2 (W.D. Wash. Feb. 13, 2025) for the proposition that "working for a corporate defendant is not the intentional misconduct required for consent to the personal jurisdiction of a foreign court." Dkt. 19 at 11.

The Court agrees with Metro Parks. First, *Kransco Mfg.* has been abrogated. *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1110 (9th Cir. 2020) ("Our statement in *Forsythe* that 'a corporate officer who has contact with a forum only with regard to the performance of his official duties is not subject to personal jurisdiction in that forum,' . . . is clearly irreconcilable with the Supreme Court's decisions subjecting corporate employes to suit in exactly those circumstances."). *Fleury* is also unhelpful. In *Fleury* the plaintiff named the CEO of FedEx and the President of Shell without alleging either of them had personal involvement in the conduct of which he complained. Metro Parks has not named O'Brien

as a defendant merely because he worked for Leisure Transport but because it alleges he was personally responsible for the conduct that caused harm to Metro Parks.

*Instasol* is also unhelpful. It involved a contract dispute to which the court applied the "purposeful availment" test. The purposeful direction is the more appropriate test for tort claims. Physical presence in the forum is not required under that test. *Lazar v. Kroncke*, 862 F.3d 1186, 1202 (9th Cir. 2017) ("The purposeful direction inquiry asks if the defendant directed an action at the forum state such that personal jurisdiction could be exercised *even without physical contacts with the forum*.") (emphasis added). It is of little significance that O'Brien has apparently never been to Washington. And the purposeful direction test may be satisfied even if the defendant has not reaped a "benefit" from their dealings with the forum state, as may be the case with many intentional torts. O'Brien also argues that the forum selection clause in Leisure Transport's terms and conditions, which designates the United Kingdom as the forum for all contract disputes, should apply to tort claims against him. Although Leisure Transport apparently concedes that the forum selection clause in Metro Parks' purchase order controls with respect to the contract dispute against it, O'Brien emphasizes that he was not a party to that agreement. But corporate officers are often considered to be bound by forum-selection clauses applicable to their employers for claims to which they apply. *See e.g.*, *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509 (9th Cir. 1988).

Metro Parks plausibly alleges that O'Brien purposefully directed his conduct toward Washington. The claims are also strictly related to O'Brien's Washington-directed actions. The next issue is whether O'Brien has made a "'compelling case' that

the exercise of jurisdiction would not be reasonable." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476–78 (1985)). In determining whether the exercise of jurisdiction over a nonresident defendant is reasonable, courts consider seven non-dispositive factors: (1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum. *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1487-88 (9th Cir. 1993). These factors are addressed in turn.

O'Brien urges that because he did not have minimum contacts with the forum, the extent of his purposeful injection into the forum state's affairs is similarly too attenuated to make the exercise of personal jurisdiction reasonable. As previously explained, the Court disagrees that O'Brien lacked minimum contacts with the forum. However, even where the defendant's conduct satisfies the purposeful direction prong, the degree of their interjection into the forum state should be factored when assessing the overall reasonableness of exercising jurisdiction. *Core-Vent*, 11 F.3d at 1488. In this case, O'Brien's injection into the forum, while not inconsequential, was not extensive. This factor weighs only slightly in favor of exercising jurisdiction.

O'Brien next argues that he will face undue burdens if forced to "defend himself in a foreign court nearly 5,000 miles from home" including the cost and disruption of air

travel for hearings, depositions, and trial. The Supreme Court has recognized that the burdens on non-U.S. litigants are particularly pronounced, instructing that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching [jurisdiction] over national borders." *Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty.*, 480 U.S. 102, 114 (1987). At the same time, "modern advances in communications and transportation have significantly reduced the burden of litigating in another country." *Sinatra v. Nat'l Enquirer, Inc.,* 854 F.2d 1191, 1199 (9th Cir. 1988). The Court also considers the burden on the defendant in light of the corresponding burden on the plaintiff of having to litigate its claims in the United Kingdom. *See Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1199 (9th Cir. 1988). On balance, the court weighs this factor weighs slightly against exercising jurisdiction.

Neither party argues that exercising jurisdiction here would create any conflict with the sovereignty of the United Kingdom. As such, the Court treats this factor as neutral.

Metro Parks argues that Washington had an interest in providing a forum for harms inflicted on Washington-based entities like itself. It correctly points out that "State[s] generally [have] a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King*, 471 U.S. at 477. This factor weighs in favor of exercising jurisdiction.

At the fifth factor, the Court considers whether exercising jurisdiction would aid in obtaining an efficient judicial resolution. Normally, the most efficient forum is the site

where the evidence is located. *Instasol*, 2018 WL 3831292, at *4 (citation omitted). In cases like these, where the evidence appears to consist largely of electronic communications, this factor normally does not clearly tip strongly in favor of either forum. *Id.* However, because this Court is exercising jurisdiction over Leisure Transport with respect to the alleged breach of contract, and because O'Brien could be called as a witness with respect to that claim, the Court will weigh this factor in favor of exercising jurisdiction and resolving all claims together.[6]

The sixth factor is concerned with the convenience and effectiveness of relief for Metro Parks as the plaintiff. It is always more convenient for the plaintiff to litigate in their home state, so this factor presumptively tips in favor of exercising jurisdiction. *Roth v. Garcia Marquez*, 942 F.2d 617 (9th Cir. 1991) ("no doctorate in astrophysics is required to deduce that trying a case where one lives is almost always a plaintiff's preference."). Nor is there any indication that Metro Parks or its staff are generally in the business of travelling abroad in the course of their duties. *See id.* at 624 (giving less weight to this factor considering the plaintiff's demonstrated ability to meet and work in foreign countries). This factor weighs in favor of exercising jurisdiction.

The seventh factor is whether an adequate alternative forum exists. Here, Metro Parks has the burden of "proving the unavailability of an alternative forum," *Core-Vent*,

[6] If O'Brien is called to testify regarding the breach of contract claim, this would also undercut his claim of burden, when the alternative would entail defending claims in the United Kingdom and *also* participating in a Washington-based proceeding.

11 F.3d at 1490, but it makes no effort to do so. Consequently, the Court this factor weighs against exercising jurisdiction.

Although the case for exercising jurisdiction here does not tip strongly in favor of Metro Parks—and is in some respects neutral—it is O'Brien's "heavy burden" to "overcome the strong presumption of reasonableness," and he has not done so. *Dole Food Co. v. Watts*, 303 F.3d 1104, 1117 (9th Cir. 2002). It is not unreasonable for the Court to exercise personal jurisdiction over O'Brien, and his motion to dismiss for lack of personal jurisdiction is **DENIED**.

**C. Metro Parks has plausibly alleged breach of contract against Leisure Transport, and fraudulent and negligent misrepresentation against O'Brien**

The defendants both move to dismiss the claims against them under Rule 12(b)(6). Leisure Transport argues that Metro Parks' breach of contract claim is deficient because it never alleged any damage resulting from the claimed breach. O'Brien also moves to dismiss the fraudulent and negligent misrepresentation claims against him for several reasons. First, that the Amended Complaint lacks a sufficient factual basis from which the Court could infer that he knew his statements were false; second, that Metro Parks could not reasonably rely on his alleged misrepresentations; and third, that Metro Parks has not alleged any proximate damage resulting from his misrepresentations. Although the Defendants argue that English law controls both the contractual and tort claims in this case, they assume "for purpose of this motion, that Plaintiff's clams are subject to Washington law." Dkt. 12 at 17 n.8.

Dismissal under Federal Rule of Civil Procedure 12(b)(6) may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). A plaintiff's complaint must allege facts to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has "facial plausibility" when the party seeking relief "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Although courts must accept as true the complaint's well-pled facts, conclusory allegations of law and unwarranted inferences will not defeat an otherwise proper Rule 12(b)(6) motion to dismiss. *Vasquez v. Los Angeles Cnty*., 487 F.3d 1246, 1249 (9th Cir. 2007); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). This requires a plaintiff to plead "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555).

When granting a Rule 12(b)(6) motion to dismiss, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990). However, when the facts are not in dispute and the sole issue is whether there is liability as a matter

of substantive law, courts may deny leave to amend. *Albrecht v. Lund*, 845 F.2d 193, 195–96 (9th Cir. 1988).

**1. Metro Parks's breach of contract claim is plausible**

Leisure Transport argues Metro Parks' breach of contract claim is deficient for two reasons: first, the contract precludes recovery of damages resulting from delay, and second, to the extent Metro Parks claims it overpaid for the fifth and sixth trams, this allegation is missing from its Amended Complaint. Metro Parks responds that it did overpay for the fifth and sixth trams, and that although it did not allege the specific amount of its damage, the allegations in its Amended Complaint are sufficient to the inference that it suffered at least *some* damage.

To establish a breach of contract claim, Metro Parks must show that the contract imposed a duty, that the duty was breached, and that the breach proximately caused damage to it. *Nw. Indep. Forest Mfrs. v. Dep't of Lab. & Indus.*, 78 Wn. App. 707, 712 (1995). Metro Parks alleges that it paid Leisure Transport $600,000 toward the fifth and sixth trams, Dkt. 1–2 at ¶3.28, and that the parties had agreed the trams would be delivered in February and March 2022, respectively. *Id.* at ¶3.3. Over a year later, Deltrain had not released the completed trams because Leisure Transport owed it almost $1 million. *Id.* at ¶3.29, 3.30. The Amended Complaint alleges that Deltrain then issued a notice of default to Leisure Transport and terminated their agreement, and that Metro Parks then had to contract directly with Deltrain to purchase the trams. *Id.* at ¶3.32. Metro Parks alleges that Leisure Transport refused to refund any of the $600,000 Metro Parks paid on the fifth and sixth trams. Viewed in the light most favorable to Metro Parks, these

allegations plausibly allege that Metro Parks was harmed. Leisure Transport's motion to dismiss the breach of contract claim is **DENIED**. Leisure Transport may investigate the amount and accuracy of Metro Parks' claimed damages in discovery.

**2. Metro Parks has plausibly alleged fraudulent and negligent misrepresentation claims against O'Brien**

O'Brien moves to dismiss the fraudulent and negligent misrepresentation claims against him. Specific to Metro Parks' fraud claim, he argues there are insufficient factual allegations to support an inference that he *knew* his statements were false. His remaining arguments take aim at elements common to both the fraudulent and negligent misrepresentation claims.[7] He argues that Metro Parks was not induced by his statements to make any payments because it was already contractually bound to make them, and that its reliance was not reasonable. He further argues that Metro Parks failed to allege any damages proximately caused by O'Brien's representations.

**A) Metro Parks alleges a sufficient factual basis for concluding that O'Brien knew his statements were false**

---

[7] Fraudulent and negligent misrepresentation are similar in many respects, but they are not identical. To establish a fraudulent misrepresentation, the plaintiff must show: (1) a representation of an existing fact; (2) the fact is material; (3) the fact is false; (4) the defendant knew the fact was false or was ignorant of its truth; (5) the defendant intended the plaintiff to act on the fact; (6) the plaintiff did not know the fact was false; (7) the plaintiff relied on the truth of the fact; (8) the plaintiff had a right to rely on it; and (9) the plaintiff had damages. *Baertschi v. Jordan*, 68 Wn.2d 478, 482 (1966).

Negligent misrepresentation requires the plaintiff to show: (1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages. *Ross v. Kirner*, 162 Wn.2d 493, 172 P.3d 701 (2007).

When alleging fraud or mistake, a party must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

O'Brien argues the Amended Complaint alleges no facts allowing the Court to infer that he knew his statements were false. "[A]lthough knowledge and intent may be averred generally," a complaint must contain "sufficient underlying facts from which a court may reasonably infer that the defendant acted with the requisite state of mind." *Sunshine Kids Juv. Prods., LLC v. Indiana Mills & Mfg., Inc.*, No. C10-5697BHS, 2011 WL 2020761, at *6 (W.D. Wash. May 24, 2011). O'Brien argues that even if his statements were false, Metro Parks cannot rely solely on its allegation that O'Brien "knew them to be false when he made them," but must allege facts that would tend to support that conclusion.

Metro Parks argues that it has done so. It recites the following allegations: O'Brien represented himself to be a Director of Leisure Transport, from which it could be inferred that he "was knowledgeable of [Leisure Transport's] financial circumstances"; he was Metro Parks' primary point of contact at Leisure Transport, from which it could be inferred that he "had knowledge regarding the contract and the trams being provided"; and he advised Metro Parks on the status of the trams and handled the processing of invoices and purchase orders relating to the contract. Dkt. 15 at 18.

Metro Parks has alleged a sufficient factual basis to infer that O'Brien knew the truth or falsity of his statements. His senior position within the defendant company and his persistent presence in its dealings with Metro Parks support an inference that he had firsthand knowledge about the progress of the trams' construction and Leisure Transport's performance (or nonperformance) of its obligations with respect to Deltrain. *Fed. Trade Comm'n v. Am. Fin. Benefits Ctr.*, 324 F. Supp. 3d 1067, 1080 (N.D. Cal.

2018) ("Circumstantial evidence regarding the individual's 'degree of participation in business affairs is probative of knowledge.'") (citation omitted). This inference is further supported by O'Brien's email—which he apparently accidentally sent to Metro Parks as well—admitting that Metro Parks would deduce that he wasn't being truthful: "That's me done, he will not believe anything I now say. We need to ensure that the payment from Guadalajara goes to releasing tram number five without fail." Dkt. 1-2 at ¶3.26. These statements tend to show that O'Brien had insight into the status of Leisure Transport's outstanding financial obligations and how they were impacting delivery timelines.

**B) Metro Parks has plausibly alleged that it relied on O'Brien's statements when issuing payments in March 2021 and January 2022, and that its reliance was reasonable**

O'Brien argues that Metro Parks cannot show justifiable reliance on his statements in either March 2021 or January 2022, for several reasons. With respect to both, he argues that Metro Parks made its payments pursuant to a preexisting contractual obligation, meaning it was required to make the payments regardless of what he said, and therefore cannot claim detrimental reliance as a matter of law. He cites several cases in support. However, none of those cases concerned a party's obligation to make incremental payments accruing only upon the performance of specific contractual obligations or a showing of satisfactory progress.[8] Metro Parks alleges that it was

[8] Dkt. 12 at 19 (citing *Goldilocks Corp. of S. California v. Ramkabir Motor Inn Inc.*, 26 F. App'x 693 (9th Cir. 2002) (tenant was not induced to stay by offer of more favorable lease terms when it was already under a lease agreement to rent the premises); *Thomas v. Bar*, 155 Wn. 640, 643 (1930) (representation that a property contained "a full hundred acres or more" was made after purchase agreement was executed and so could not have induced buyer to enter the agreement);

obligated to make payments only upon the occurrence of specific events—i.e. the "commencement of production" and "factory acceptance test on [fifth] complete train"—and that it relied on O'Brien's representations that those benchmarks had been met when issuing payments of $350,000 and $250,000. Metro Parks has plausibly alleged that it would not have issued those payments but for O'Brien's representations.

Concerning the March 2021 exchange, O'Brien argues that Metro Parks has misrepresented what he said. In Metro Parks' version, the parties agreed that 35% of the purchase price would be due *after* production had started, and that it would not have issued the payment but for O'Brien's alleged representation that "both the 5th and 6th tram were in production." Dkt 1–2 at ¶¶3.10, 3.11. In response, O'Brien submitted a copy of an email exchange between O'Brien and Metro Parks from March 2021, Dkt. 14–5, which he insists is the exchange Metro Parks is referring to and therefore can be considered on a motion to dismiss.

In the email, O'Brien asks Metro Parks "if the trams 5 and 6 will still be on schedule to start this month," to which Metro Parks responds, "yes, we are on schedule to start trams 5 & 6." Metro Parks then asks O'Brien to sign and return its purchase order form so that it could process payment. The form stated, "[Metro Parks] agrees to make a 35% down payment for the purchase of materials . . . *and to initiate fabrication* (if

---

*Newingham v. Newingham*, 199 Wn. App. 1009 (2017) (rejecting argument that party was induced to enter a commission agreement to which he was already bound); *Wilson v. Bank of Am.*, No. C12-1532JLR, 2013 WL 275018, at *6 (W.D. Wash. Jan. 24, 2013) (plaintiffs could not show reasonable reliance when their briefing explicitly stated that they had not relied on the defendants' representations).

required).” (emphasis added). When O’Brien returned the form, he said “please find attached the completed and signed purchase order for trams 5 and 6. I will let the factory know they can proceed *on receiving payment*.” Dkt. 14–5 (emphasis added).

Metro Parks’ response acknowledges that the Court can consider extrinsic documents when ruling on a motion to dismiss but argues that the “email is neither quoted nor referenced in Metro Parks’ complaint,” and that it “therefore objects to the Court considering the unauthenticated Exhibit 5 email.” Dkt. 15 at 19–20. Although Metro Parks does not identify an alternative source for its allegation that O’Brien told it that “both the 5th and 6th tram were in production,” Dkt. 1-2 at ¶3.10, this is not a summary judgment motion, and the Court will not make assumptions as to which allegations Metro Parks can or cannot support with competent evidence. At this juncture the Court is concerned only with the plausibility of the factual allegations contained in the Amended Complaint. O’Brien may deny those allegations and rebut them with his evidence in later proceedings.

O’Brien next argues that his statements in January 2022 anticipating the completion dates for the fifth and sixth trams were not statements of existing fact but were instead statements about future performance. Metro Parks persuasively argues that O’Brien’s statement was a representation of existing fact, i.e. that the “trams were nearing completion,” and that this was false because production had not yet started. Under Washington law, both fraudulent and negligent misrepresentation claims require a false statement of *existing* fact. *Glacier Nw., Inc. v. Int’l Bhd. of Teamsters Loc. Union No. 174*, 500 P.3d 119, 135 (2021), *reversed on other grounds*, 598 U.S. 771 (2023). The

general rule is that a representation that something will be done in the future, or a promise to do it, cannot be considered a representation of fact because such a statement "from its nature cannot be true or false at the time when it is made." *Shook v. Scott*, 56 Wn.2d 351, 355 (1960).

It is less clear, however, whether a prediction or promise of future events that is unreasonable, or impossible, can give rise to a claim for fraud or negligent misrepresentation. The Court is unaware of any Washington authority touching on this precise question. However, courts in other jurisdictions have held that in some situations, a promise or prediction of future performance that is impossible or unreasonable can be treated as a representation of existing fact. *See R.R.S. II Enterprises, Inc. v. Regency Associates*, 646 N.E.2d 56 (Ind. Ct. App. 1995) (representation that shopping mall would have double lane traffic was held to be a misrepresentation of existing fact because the speaker knew it would be impossible); *CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 514 N.E.2d 116 (1987) (inflated estimates of business' future performance actionable as fraud where they were "unreasonable and . . . were not based on [its] actual financial condition."). Although O'Brien's statement that the fifth tram would be completed the following week was a statement of future performance, implicit in that statement was an assurance that production had, at the very least, begun—an existing fact. Metro Parks alleges that it had not. And while optimistic predictions that fail to materialize are not the stuff of fraud or negligent misrepresentation, there is a plausible basis for treating O'Brien's arguments differently.

Lastly, O'Brien echoes Leisure Transport's argument that Metro Parks failed to allege any injury arising from his alleged misrepresentations. This argument is unpersuasive because Metro Parks has alleged that it overpaid for the fifth and sixth trams, and that the payments it made to Leisure Transport were induced by what O'Brien told it.

O'Brien's motion to dismiss Metro Parks' fraudulent and negligent misrepresentation claims is **DENIED**.

## III. ORDER

Therefore, it is hereby **ORDERED** that the defendants' motion to dismiss, Dkt. 12, is **DENIED**.

Dated this 5th day of October, 2026.

BENJAMIN H. SETTLE
United States District Judge